PROVIDENCE WASHINGTON INSURANCE COMPANY and Hamilton Painting, Appellants,

v.

Virgil F. GRANT and Alaska Workers' Compensation Board, Appellees.

Virgil F. GRANT, Cross-Appellant,

v.

PROVIDENCE WASHINGTON INSURANCE COMPANY and Hamilton Painting, Cross-Appellees.

Nos. 7903, S–7.

Supreme Court of Alaska.

Jan. 25, 1985.

---

Robert B. Mason, Anchorage, Mark A. Sandberg, Camarot, Sandberg & Hunter, Anchorage, for appellants/cross-appellees.

Chancy Croft, Anchorage, for appellee/cross-appellant.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

·MOORE, Justice.

This case involves a dispute over the method used by the Alaska Workers' Compensation Board [hereinafter "board"] to compute Virgil Grant's permanent partial disability benefits under the Alaska Workers' Compensation Act.[1] Virgil Grant has been a structural painter and sandblaster for the last thirty years. On February 23, 1980, while working for Hamilton Painting [hereinafter "employer"], Grant fell more than thirty feet from a ladder, injuring his back, knee, ankle and ribs. On May 5, 1981 Grant's physician, Dr. Linder, released Grant to return to work, provided that his work did not require lifting more than 30 pounds or require repeated bending or stooping. Aside from a short return to Hamilton Painting, the only employment Grant held between the date he was injured and April 23, 1982, the date of the board's second ruling on Grant's case, was a job as an indoor painter on an on-call basis.

The statute used to determine compensation for permanent partial disability is AS 23.30.190. When Grant's case went before the board[2] AS 23.30.190 provided in part:

*Compensation for permanent partial disability.* (a) In case of disability partial in character but permanent in quality the compensation is 66⅔ per cent of the injured employee's average weekly wages in addition to compensation for temporary total disability or temporary partial disability paid in accordance with

AS 23.30.185 or 23.30.200, respectively, and shall be paid to the employee as follows:

.   .   .   .   .

(2) leg lost, 248 weeks compensation, not to exceed $40,320;

.   .   .   .   .

(4) foot lost, 173 weeks compensation, not to exceed $28,700;

.   .   .   .   .

(20) in all other cases in this class of disability the compensation is 66⅔ per cent of the difference between his average weekly wages and his wage-earning capacity after the injury in the same employment or otherwise, payable during the continuance of the partial disability, but subject to reconsideration of the degree of the impairment by the board on its own motion or upon application of a party in interest; whenever the board determines that it is in the interest of justice, the liability of the employer for compensation, or any part of it as determined by the board, may be discharged by the payment of a lump sum;

.   .   .   .   .

(b) Total compensation paid under (a)(20) of this section may not exceed $60,000.

On December 11, 1981, the board issued an order determining Grant's entitlement under the Alaska Workers' Compensation Act. The board found that Grant could not return to his previous occupation and was entitled to permanent partial disability benefits beginning October 30, 1981.[3] The board ordered the employer to pay Grant an interlocutory award of $74.79 per week and invited the parties to petition for a modification of the order when information that more accurately determined Grant's loss of earning capacity became available.

---

1. The Act is codified as AS 23.30.005–23.30.270. AS 23.30.045 provides that the employer is liable for the payment of benefits to employees for disabilities covered by the Act regardless of fault.

2. The statute was amended effective January 1, 1984 to increase *inter alia* the amounts of compensation payable. Chapter 70 § 7 SLA 1983.

These amendments do not affect the issues in this case.

3. The board found that prior to October 30, 1981, Grant had been temporarily totally disabled and awarded him benefits for this temporary disability pursuant to AS 23.30.185.

On December 17, 1981, Grant petitioned the board for a redetermination of the December 11, 1981 order of permanent partial disability. He argued that under the workers' compensation statute he was entitled to separate awards for his back, knee and foot injuries. The board agreed and ordered weekly payments of $373.78 for Grant's knee disability and $373.78 for his foot disability, until the respective sums of $6,048 and $2,870 had been paid. The award for the foot disability was to begin when the award for the knee disability ended. The knee and foot disability awards were based on Dr. Linder's November 20, 1981 report that Grant suffered a 10% impairment to his foot and a 15% impairment to his knee.[4]

The board found that Grant's back disability was an unscheduled disability compensable under AS 23.30.190(a)(20), which then provided that "in all other cases ... the compensation is 66⅔ per cent of the difference between his average weekly wages and his wage-earning capacity after the injury...." The board found that Grant was employable but that he had not made all reasonable efforts to find employment, and stated that it could not evaluate Grant's loss of earning capacity until Grant had a more complete history of post-injury earnings.[5] The board then multiplied Grant's compensation rate of $373.78 weekly by the 15% impairment to Grant's back to compute an interlocutory award of $56.07 weekly for the back injury.[6] The parties were invited to request another hearing on the award for the back injury when more information on Grant's loss of earning capacity became available. Grant's employer appealed the board's order to the superior court and that court affirmed the order.

## I. COMPENSATION FOR SCHEDULED OR UNSCHEDULED INJURIES

On appeal to this court, the employer argues that the approach taken by the board constitutes a double recovery for Grant. The basis of this argument is that Grant was separately awarded compensation for the scheduled disabilities of his knee and foot under AS 23.30.190(a)(2) and (4), respectively, and that his loss of earning capacity resulting from these scheduled injuries was also incorporated into the award for the unscheduled injury of his back, because that award is determined by the employee's loss of earning capacity un-

4. The board determined Grant's average weekly wage for purposes of the scheduled impairments of the knee and foot to be $560.64. Following the guidance of AS 23.30.190(a), the board computed Grant's compensation rate to equal 66⅔% of this amount, or $373.78 weekly. To determine the amount Grant was entitled to for the knee injury under AS 23.30.190(a)(2), the board multiplied the compensation rate of $373.78 by the 15% impairment of the knee by 248 weeks to arrive at $13,904.62. The board then multiplied the 15% impairment of the knee by the maximum allowed under AS 23.30.190(a)(2) of $40,320 to get $6,048. The board then followed *Cesar v. Alaska Workmen's Compensation Board,* 383 P.2d 805 (Alaska 1963), in awarding the lesser of these two figures, awarding Grant $6,048. In computing the compensation due Grant for the foot injury under AS 23.30.190(a)(4), the board multiplied the 10% impairment of the foot by the compensation rate of $373.78 by 173 weeks and obtained a result of $6,466.39. The board then found that the 10% impairment multiplied by the maximum recovery allowed under AS 23.30.190(a)(4) produced compensation of $2,870. The court

again followed *Cesar* and awarded Grant $2,870 for his foot injury because this was the lesser of the two figures.

5. The board found it difficult to determine Grant's loss of wage-earning capacity because, since his fall, Grant had not held employment commensurate with his experience and training. In 1978 and 1979 Grant received training in petroleum technology; after his fall, he received training in painting estimating from Hamilton Painting. Grant had recently taken employment as an indoor painter, but it was unclear how long this job would continue, and Grant was making only four to five dollars an hour, which was far below his pre-injury wages as a union painter.

6. The board based its finding that Grant suffered a 15% impairment of his back on Dr. Linder's statement in his November 20, 1981 report that Grant suffered a "15% permanent partial impairment of the whole man based on chronic and permanent symptoms in his low back and legs as a result of aggravation of the pre-existing degenerative arthritis...."

der AS 23.30.190(a)(20). The employer argues that, if an employee has both an unscheduled disability and a scheduled disability, there should not be a separate award for the scheduled disability under AS 23.-30.190(a)(1)–(19), but rather the scheduled disability should be compensated under AS 23.30.190(a)(20), because this section awards benefits according to the employee's loss of earning capacity resulting from all disabilities.

■ We disagree with the employer's interpretation of the statute. AS 23.30.-190(a)(1)–(19) provides for specific amounts of compensation for specific disabilities, such as the loss of body members, digits, hearing and vision. An employee is not required to show loss of earning capacity resulting from a scheduled disability. *Bignell v. Wise Mechanical Contractors*, 651 P.2d 1163, 1167 (Alaska 1982). In contrast, an employee's compensation for unscheduled injuries under AS 23.30.190(a)(20) is based on the employee's loss of wage-earning capacity. This distinction is the result of a legislative judgment that when a scheduled injury occurs there is usually a corresponding loss of earning capacity,[7] and that the objectives behind the Workers' Compensation Act are achieved more efficiently if the employee is not required to show this loss of earning capacity.[8] It would abrogate this distinction to hold that whenever an employee has an unscheduled injury coupled with a scheduled injury, the claimant loses the entitlements of AS 23.-30.190(a)(1)–(19) for the scheduled injury and is limited to those of AS 23.30.-190(a)(20).

■ We hold that the board properly found that Grant was entitled to compensation under AS 23.30.190(a)(2), (4) and (20) because of the disabilities to his knee, foot and back. We recognize that this approach could result in a double recovery if the loss of earning capacity resulting from the scheduled injuries were used to determine the employee's compensation for an unscheduled disability. To avoid this, when awarding the claimant for an unscheduled injury, the board must attempt to separate the loss of earning capacity resulting from scheduled disabilities from the loss of earning capacity resulting from the unscheduled injury.

In the case at bar, the board made an interlocutory award for the unscheduled disability because it did not have sufficient information at that time to accurately determine Grant's loss of wage-earning capacity. The board found that, based on Dr. Linder's ratings, Grant suffered a 15% impairment of his back. The board then based Grant's interlocutory award on the 15% impairment of his back. When the board makes its final determination of the compensation due Grant for his back injury, it should isolate his loss of earning capacity resulting from his back injury. Grant's award under AS 23.30.190(a)(20) should then be computed on the basis of the loss of earning capacity resulting from his back disability and not his foot or knee disabilities. The board may compensate Grant for his back injury based on the total loss of earning capacity resulting from his fall only if the board finds that his loss of earning capacity resulting from his foot or knee disabilities cannot be severed from his loss of earning capacity resulting from his back injury.[9] Thus, in such a situation,

---

**7.** The loss of earning capacity for scheduled injuries is "conclusively presumed." 2 A. Larson, The Law of Workmen's Compensation, § 58.11, at 10–174 (1983).

**8.** "The purpose of the Workmen's Compensation Act ... is the provision of financial and medical benefits for victims of work-connected injuries in the most efficient, most dignified, and most certain form." *Arctic Structures, Inc. v. Wedmore*, 605 P.2d 426 (Alaska 1979).

**9.** AS 23.30.210 provides in part:

*Determination of wage-earning capacity.* In a case of partial disability under AS 23.30.-190(20) ... the wage-earning capacity of an injured employee is determined by the actual spendable weekly wage of the employee if the actual spendable weekly wage fairly and reasonably represents the wage-earning capacity of the employee....

When, as in this case, there is a scheduled disability and an unscheduled disability, the board should extrapolate what the claimant's

Grant would be entitled to an award based on his total loss of earning capacity resulting from his fall plus an award for his scheduled injuries.

## II. FORMULA FOR DETERMINING COMPENSATION

■ In *Cesar v. Alaska Workmen's Compensation Board,* 383 P.2d 805 (Alaska 1963), the claimant lost one-half of his thumb in the course of his employment. The scheduled award for the loss of a thumb at that time was fifty-one weeks of compensation, not to exceed a total of $1,800. The claimant argued that the formula that should be used to determine his compensation should be 65%[10] of his average weekly wage multiplied by one-half of 51 weeks, not to exceed the $1,800 limit imposed by statute. This court held that since the claimant lost half of his thumb he was entitled to only one-half of the compensation that an employee would receive for losing an entire thumb, and that the maximum amount that could be collected was one-half of what it would be for the loss of an entire thumb.[11] 383 P.2d at 805.

In awarding for Grant's knee and foot injuries the board took 66⅔% of Grant's average weekly wage of $560.64 to arrive at a compensation rate of $373.78 weekly. The board then multiplied this figure by the impairment percentages of 15% and 10% for the knee and foot, respectively, and by the number of weeks of compensation allowed for each injury under AS 23.-30.190(a)(2) and (4). Under this formula Grant would be entitled to $13,904.62 for his knee disability and $6,466.39 for his foot disability. The board then multiplied the impairment percentages for Grant's knee and foot injuries by the maximum amounts of $40,320 and $28,700 allowed in

AS 23.30.190(a)(2) and (4), respectively. This calculation yielded $6,048 for Grant's leg injury and $2,870 for his foot injury. Under the direction of *Cesar* the board awarded Grant compensation according to this latter formula because it produced the smallest award.

On cross-appeal Grant urges us to overrule *Cesar.* We agree that the results compelled by *Cesar* are contrary to the plain meaning of and policies behind AS 23.30.190. The provisions for scheduled disabilities dictate the number of weeks by which the compensation rate should be multiplied to compute the total compensation due an employee. These subsections also state the maximum amount that can be awarded for the scheduled injury. For example, AS 23.30.190(a)(2) provides: "leg lost, 248 weeks compensation, not to exceed $40,320...." The plain language of this provision does not require that the maximum amount recoverable be multiplied by the percentage of impairment to the body member or function. Instead, it states the maximum amount recoverable under the subsection without referring to the percentage of impairment.

Overruling *Cesar* is consistent with the policies behind the Workers' Compensation Act. The purpose of the Act is to award benefits to the victims of work-related injuries regardless of fault. *Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426 (Alaska 1979). Realizing that uncertainty and hardship would result from unlimited liability, the legislature established absolute limits on employers' liability under the Act. By establishing a maximum award of $40,320 for a leg disability, the legislature intended to assure employers that their liability under AS 23.30.190(a)(2) would never exceed $40,320. To follow *Cesar* and re-

spendable weekly wage would be if the claimant suffered only from the unscheduled disability.

**10.** At that time the compensation rate of AS 23.30.190 was 65% of the employee's average weekly wages. When Grant's case was ruled on by the board the compensation rate for scheduled injuries was 66⅔% of the employee's average weekly wages.

**11.** Cesar's average weekly wage was $115. Applying the formula without limiting the recovery by the statutory maximum, Cesar was entitled to $1,906.25 for 65% of $115 × ½ × 51. The statute at that time limited the recovery for a thumb to $1,800 and the court agreed with the board that the maximum recovery for the loss of one-half of a thumb is one-half of this or $900.

quire that the maximum awards be pro-rated according to the employee's percentage of impairment to the body member or function would not further the policy of placing absolute limits on an employer's liability under the Act. Instead, such a requirement undermines the legislative policy, embodied in AS 23.30.190(a)(1)–(19), to award no more than specific amounts for specific disabilities, because the *Cesar* approach frequently requires that a claimant's award be reduced.[12]

In overruling *Cesar*, we are aware that the legislature has not amended the statute to displace the construction *Cesar* gave to it. Although AS 23.30.190 has been amended several times,[13] none of the amendments has addressed this problem. We do not, however, believe that the legislature's silence indicates approval of the *Cesar* rule. Nor are we faced with a comprehensive revision and re-enactment of the statute that might raise a presumption of legislative approval.

As Mr. Justice Frankfurter observed many years ago,

It would require very persuasive circumstances enveloping congressional silence to debar this Court from re-examining its own doctrines. To explain the cause of nonaction by Congress when Congress itself sheds no light is to venture into speculative unrealities. Congress may not have had its attention directed to an undesirable decision.... [W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.

*Helvering v. Hallock,* 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 612–13 (1940) (footnotes omitted). We have found no references to the problem *Cesar* addressed in the legislative history of the statute's original enactment and its later amendments. Legislative inaction frequently indicates unawareness, preoccupation or paralysis.[14] We decline to attribute significance to the legislature's mere inaction.[15]

The legislature has never undertaken a comprehensive revision of AS 23.30.190. Each time the statute has been amended, the amendments have been specific and limited, and the statute's general form has remained the same.[16] No single amendment has constituted a "re-enactment" of AS 23.30.190. "Whatever may be the scope of the doctrine that re-enactment of a statute impliedly enacts a settled judicial construction placed upon the re-enacted statute, that doctrine has no relevance to the present problem." *Helvering v. Hallock,* 309 U.S. 106 at 121 n. 8, 60 S.Ct. at 452 n. 8, 84 L.Ed. 604 at 613 (1940). Thus we hold that the legislature has not implicitly forbidden us to re-examine a decision we now believe erroneous.

**12.** Grant's award was based on an average weekly salary of $560.64. While this is above the median income level, it is not so high as to make this case an aberration.

**13.** *See* n. 16 *infra.*

**14.** *See Zuber v. Allen,* 396 U.S. 168, 186 n. 21, 90 S.Ct. 314, 324 n. 21, 24 L.Ed.2d 345, 356 n. 21 (1969).

**15.** *See Bob Jones Univ. v. U.S.,* 461 U.S. 574, ————————, 103 S.Ct. 2017, 2032–33, 76 L.Ed.2d 157, 178–79 (1983).

**16.** Since we decided *Cesar,* AS 23.30.190 has been amended ten times, as follows: Sections 5–10, ch. 46 SLA 1964 (raising the ceilings set out in what are now AS 23.30.190(a)(1)–(5) and (12); § 1, ch. 24 SLA 1965 (elaborating on the "disfigurement" provisions); § 1, ch. 102 SLA 1965 (correcting a typographical error); § 1, ch. 174 SLA 1968 (allowing the board to award compensation for permanent partial disability in a lump sum); § 1, ch. 119 SLA 1970 (raising the ceilings set out in what are now AS 23.30.190(a)(1)–(12)); § 1, ch. 10 SLA 1972 (raising the ceilings set out in what are now AS 23.30.190(a)(1)–(12) and (19)); § 1, ch. 54 SLA 1974 (adding a catchall provision in subsection (19)); § 5, ch. 83 SLA 1975 (changing the basic compensation figure from 65% of an employee's "average weekly wage" to 2/3 of that wage, and raising the ceilings set out in what is now AS 23.30.190(a)(1)–(12)); § 4, ch. 75 SLA 1977 (setting a $60,000 cap on compensation payable under AS 23.30.190(a)(2)); § 7, ch. 70 SLA 1983 (changing the basic compensation figure from 2/3 of an employee's "average weekly wage" to 4/5 of the "spendable weekly wage" and raising the ceilings set out in AS 23.30.190(a)(1)–(12)).

The last of these amendments occurred after Grant's injury and does not affect this case.

## III. ATTORNEY'S FEES

In the first order of the board, issued December 1981, the employer was ordered to pay attorney's fees of $400 in the permanent partial disability award pursuant to AS 23.30.145(b).[17] In its April 1982 order the board found that the employer had controverted Grant's claim and ordered the payment of his attorney's fees pursuant to the statutory minimum of AS 23.30.145(a).[18] In February 1982, the superior court entered an order granting additional attorney's fees to Grant in the amount of $1,937.50 for his successful appellate work.[19]

 The employer mistakenly argues that the superior court's award of attorney's fees [20] should be overturned due to its alleged nonconformity with Appellate Rule 508. In *McShea v. State of Alaska*, 685 P.2d 1242 (Alaska 1984), we held that AS 23.30.145(c) controls the role of the superior court in determining attorney's fees in workers' compensation appeals. Accordingly, we affirm the superior court's award.

The employer further argues that the board's April 1982 award of attorney's fees under AS 23.30.145(a) was improper because it should have been reduced by the board's December 1981 award of $400 in attorney's fees under AS 23.30.145(b). We disagree. The $400 award under AS 23.30.145(b) was made for the distinct purpose of restarting benefits that the employer had stopped. It was not merely a first installment on the later award made under AS 23.30.145(a). Consequently, we also affirm on this issue.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

17. The employer was also ordered to pay attorney's fees pursuant to the minimum of AS 23.30.145(a) on the temporary total disability benefits paid from May 5, 1981 to July 24, 1981.

18. AS 23.30.145 provides in part:

   *Attorney fees.* (a) Fees for legal services rendered in respect to a claim are not valid unless approved by the board, and the fees may not be less than 25 per cent on the first $1,000 of compensation or part of the first $1,000 of compensation, and 10 per cent of all sums in excess of $1,000 of compensation. When the board advises that a claim has been controverted, in whole or in part, the board may direct that the fees for legal services be paid by the employer or carrier in addition to compensation awarded; the fees may be allowed only on the amount of compensation controverted and awarded. When the board advises that a claim has not been controverted, but further advises that bona fide legal services have been rendered in respect to the claim, then the board shall direct the payment of the fees out of the compensation awarded. In determining the amount of fees the board shall take into consideration the nature, length and complexity of the services performed, transportation charges, and the benefits resulting from the services to the compensation beneficiaries.

   (b) If an employer fails to file timely notice of controversy or fails to pay compensation or medical and related benefits within 15 days after it becomes due or otherwise resists the payment of compensation or medical and related benefits and if the claimant has employed an attorney in the successful prosecution of this claim, the board shall make an award to reimburse the claimant for his costs in the proceedings, including a reasonable attorney fee. The award is in addition to the compensation or medical and related benefits ordered.

19. Although no statute was cited, it appears that the superior court made its award under AS 23.30.145(c), which provides in part:

   (c) If proceedings are had for review of a compensation or medical and related benefits order before a court, the court may allow or increase an attorney's fees. The fees are in addition to compensation or medical and related benefits ordered and shall be paid as the court may direct.

20. Grant's attorney has since stipulated to a reduction of the superior court's award of $1,937.50 to $1,906.25, the amount actually sought.